# In the United States Court of Federal Claims

No. 23-1000
Filed: November 12, 2024
Re-issued: December 3, 2024[1]

_____
                                            )

ADVANCED TECHNOLOGY SYSTEMS   )
COMPANY,                                  )
                                       )
                   _Plaintiff,_         )
                                       )
     v.                                   )
                                       )
THE UNITED STATES,                  )
                                       )
                   _Defendant._      )
_____  )

_Anuj Vohra_, Crowell & Moring LLP, Washington, D.C., for Plaintiff Advanced Technology Systems Company.

_Geoffrey M. Long_, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were _Brian M. Boynton_, Principal Deputy Assistant Attorney General, _Patricia M. McCarthy_, Director, and _Douglas K. Mickle_, Assistant Director, for the Government. _Jessica K. Eddy_, Associate Counsel, NAVSEA HQ, _of counsel_.

## OPINION AND ORDER

**MEYERS, Judge**.

      Advanced Technology Systems Company ("ATSC") worked for several years to develop a maritime radar system for the Arab Republic of Egypt,[2] pursuant to a procurement conducted by the Egyptian government. Egypt then turned to the United States to procure ATSC's solution through a foreign military sales program. The United States, acting through the Navy, approved

---

[1] The court initially filed this Opinion and Order under seal to allow the parties to propose redactions. The parties submitted their proposed redactions, ECF No. 79-1, and the court has incorporated those proposed redactions and makes them with bracketed asterisks ("[ * * * ]") below.

[2] There have been significant discussions between the United States Navy and the Egyptian Navy regarding this procurement. The court refers to the Egyptian entities collectively as "Egypt" and references the United States entities as the "Navy" or the "Government."

Egypt's request for a sole source award to ATSC and then began working with ATSC to learn the details of its proposal. During this process, ATSC provided significant amounts of proprietary information to the Navy, which it marked appropriately. The Navy had some early reservations about proceeding on a sole source basis, and these concerns grew over the course of the development of the procurement. In the end, the Navy made several recommendations to Egypt that it change its request to allow full and open competition. ATSC considers the Navy's lobbying to be unfair and seeks an order directing the Navy to return the Egypt procurement back to a sole source award.

By statute, the Navy must conduct this procurement consistent with American law. Chief among those for this case is the Competition in Contracting Act ("CICA"), which mandates that the default rule for federal procurements is for full and open competition. There are, however, specific exceptions to the default rule that are enumerated in the statute. Among them is an exception that allows for other than full and open competition in cases involving foreign military sales—if the foreign government asks for a sole source award. In this case, Egypt withdrew its request for a sole source award, meaning that there is no CICA exception that applies. ATSC, however, alleges that Egypt only changed its mind due to unfair lobbying by the United States Government and asks the court to enter an injunction ordering the procurement to return to a sole source award to ATSC. Because this court cannot order Egypt to amend its request again to insert a sole source requirement and ATSC does not identify any other CICA exception that applies, the court cannot grant ATSC the relief that it seeks for the alleged unfair conduct by the United States Government.

ATSC also complains that the United States Government obtained significant amounts of ATSC's proprietary information during the sole source procurement, which the Government unlawfully disclosed in its solicitation for a competitive procurement. According to ATSC, these violations also entitle it to an injunction ordering the Government to return to the sole source procurement. But here Congress has spoken clearly—the *exclusive* remedy for the disclosure of protected information by the Government in connection with a foreign military sale is "reasonable and entire compensation" for the disclosure. 22 U.S.C. § 2356(a). In other words, Congress has chosen not to allow ATSC to get an injunction, but it does allow ATSC (if it proves an unlawful disclosure) to "go on, take the money and run." Steve Miller Band, Take the Money and Run (Capitol Records 1976).

Therefore, the court denies ATSC's motion for judgment on the administrative record and grants the Government's cross-motion for judgment on the administrative record without prejudice to ATSC filing an action under 22 U.S.C. § 2356 if and when it is harmed by the alleged disclosure of its protected information.

## I.    Background

ATSC brought this pre-award bid protest challenging the procurement under U.S. Navy Solicitation No. N0002423R310. *See* ECF No. 15 at ¶ 1. The solicitation seeks a "Nationwide Maritime Surveillance System" to be sold by the United States to Egypt via the Department of Defense ("DOD") Foreign Military Sales ("FMS") program. *Id.*

### A.    The FMS Program

The FMS program is part of the Government's "security cooperation enterprise," and under the program, the DOD sells defense articles and services from its inventory and contracts to eligible foreign countries and international organizations. *See* 22 U.S.C. §§ 2761-2762; 48 C.F.R. § 225.7301(a) ("The U.S. Government sells defense articles and services to foreign governments or international organizations through FMS agreements."); ECF No. 29 at 2; ECF No. 67 at 6-7. The Defense Security Cooperation Agency ("DSCA") "directs, administers, and provides guidance for the FMS program." ECF No. 29 at 2; ECF No. 67 at 7. DSCA's guidance is in the Security Assistance Management Manual ("SAMM"), DSCA Manual 5105.38-M; and DSCA issues its guidance under "the authority of DoD Directive 5105.65." ECF No. 29 at 2-3; ECF No. 67 at 7. "The SAMM establishes policies and procedures, and provides guidance, for the administration and implementation of" the FMS program under the Foreign Assistance Act of 1961, as amended, 22 U.S.C. § 2151 *et seq.*; the Arms Export Control Act of 1976, as amended, 22 U.S.C. § 2751 *et seq.*; the Federal Acquisition Regulation ("FAR"); the Department of Defense Federal Acquisition Regulation Supplement; and other related statutes and directives. ECF No. 29 at 3; ECF No. 67 at 7.

The FMS program informally begins when a foreign government initially assesses its needs and then contacts "specially designated United States Government security assistance personnel who can further assist the country with defining its requirements, timelines, financing, the like." ECF No. 29 at 3; ECF No. 67 at 7-8; *see* 22 U.S.C. § 2321i(a) (allowing the President to "assign members of the Armed Forces" to help a foreign government in the FMS program); SAMM § C2.1. The foreign government can then "formally begin[] the FMS process" when it sends a Letter of Request ("LOR") to the United States Government. ECF No. 29 at 3; ECF No. 67 at 8; *see* SAMM §§ C5.1.1-.2. The United States Government sends the LOR to the appropriate U.S. implementing agency. *See* SAMM § C5.1.5; ECF No. 29 at 4; ECF No. 67 at 8.

The implementing agency's staff then reviews the LOR "to ensure it meets the requirements of applicable United States laws, regulations, and policies." ECF No. 29 at 4 & n.3; ECF No. 67 at 8 & n.5; *see* SAMM § C5.1.7. After review and validation of the LOR, the implementing agency responds to the foreign government with "Price and Availability (P&A) data, Letters of Offer and Acceptance (LOAs), [or] other appropriate actions." SAMM § C5.2.1; *see* ECF No. 29 at 4; ECF No. 67 at 8. "If an eligible country or international organization wishes to receive an offer from the United States Government, it submits an LOR for an LOA." ECF No. 29 at 4; ECF No. 67 at 8. The LOA "is the legal instrument used by the [Government] to sell defense articles, defense services including training, and design and construction services to a foreign country." SAMM § C5.4.1; *see* ECF No. 29 at 4; ECF No. 67 at 8. The implementing agency develops the LOA based on ongoing conversations with the foreign government about its needs. *See* ECF No. 29 at 6; ECF No. 67 at 10; SAMM § C6.3.5.

The proposed LOA triggers a multi-level review process within the United States Government. *See* ECF No. 29 at 4; ECF No. 67 at 8-9. First, the proposed LOA is submitted to DSCA and the Department of State "for review and approval." *See* SAMM § C5.1.6; ECF No. 29 at 4; ECF No. 67 at 8. Second, when applicable, DSCA submits "notice to Congress . . . before an implementing agency may provide the LOA to the eligible country" because Congress can enact a joint resolution to prohibit some FMS sales. *See* ECF No. 29 at 4; ECF No. 67 at 8; 22 U.S.C. § 2776(b); SAMM § C5.5.1. Third and finally, DSCA and the implementing agency sign and send the LOA to the foreign government. ECF No. 29 at 4; ECF No. 67 at 9.

The foreign government then reviews and signs the LOA.  ECF No. 29 at 4; ECF No. 67 at 9.  "Signed LOAs and their subsequent Amendments and Modifications are" FMS cases.  SAMM § C5.4.1; ECF No. 29 at 4; ECF No. 67 at 8.  To satisfy the LOA requests, the implementing agency "can provide the requested defense articles or services from its own stock or by negotiating a contract with the defense industry through designated United States Government contracting officers."  ECF No. 29 at 5; ECF No. 67 at 9; *see* SAMM § C4.4.1.  An implementing agency must conduct a procurement for an FMS case using the "same acquisition and contract management procedures used for other defense acquisitions," 48 C.F.R. § 225.7301(b), and the same procurement law applies, *see* ECF No. 29 at 5; ECF No. 67 at 9.  The foreign government cannot "direct source selection decisions or contract terms," except that the foreign government may make a sole source request in the LOA.  *See* ECF No. 29 at 5; ECF No. 67 at 10; 10 U.S.C. § 3204(a)(4); 48 C.F.R. § 206.302-4; SAMM § C6.3.5.  The implementing agency continues its discussions with the foreign government "prior to actual implementation to ensure" the procurement meets the foreign government's needs.  *See* SAMM § C6.3.5; ECF No. 29 at 5; ECF No. 67 at 10; SAMM § C6.3.5.  These discussions may result in amendments or modifications to the LOA, such as the addition or removal of a sole source request.  *See* ECF No. 29 at 5; ECF No. 67 at 10; SAMM § C6.7.

## B.    The Egyptian Procurement and the Resulting 2019 LOR

Prior to the United States Government's involvement, Egypt sent ATSC the following letter in 2018:

> ATSC is hereby requested to provide, however without any
> [ * * * ]

ECF No. 56-1 at AR100266.[3]  ATSC responded with a proposal for its Nation-wide Maritime Surveillance System ("NMSS").  ECF No. 56-6 at AR111112-97.

Egypt then turned to the FMS program to procure its coastal surveillance system.  On August 17, 2019, Egypt issued an LOR for an LOA to the United States Government for a coastal surveillance system.  ECF No. 56-1 at AR100376-98.  The LOR requests several ATSC-specific articles, including:

- ATSC [ * * * ] . . .

- ATSC [ * * * ] . . .

- ATSC [ * * * ] . . .

- ATSC [ * * * ] . . .

- ATSC [ * * * ] . . .

---

[3] Because the administrative record spans multiple docket entries, the court cites to the ECF docket number and AR page.

- ATSC [ * * * ] . . .

- . . . ATSC [ * * * ] . . .

*Id.* at AR100377. Further, the 2019 LOR requests the contract "be Sole Sourced to ATSC." *Id.* at AR100376. Egypt included a ten-point list in its 2019 LOR to explain and support its request for a sole source award to ATSC. *Id.* at AR100397-98.

The United States Government, however, had reservations about a sole source award. Col. Kenneth W. Dobbertin, Chief of the U.S. Office of Military Cooperation ("OMC")-Egypt, did not concur with Egypt's sole source request based on cost concerns, Egypt's "checkered history" with sole source requests, and inadequacies in ATSC's training plan:

> [T]he OMC does not concur with this sole-source LOR.
>
> During Financial Management Reviews, Security Assistance Reviews, Defense Resourcing Conference, and the Military Cooperation Committee, the U.S. Government (USG) recommended open source LORs as a best practice. In consideration of Egypt's reliance on FMF and Egypt's checkered history with sole-source LORs, the OMC encourages an open procurement process. This approach will generate multiple bids, as well as an accurate estimate of the project's costs. This approach is the best course of action for Egypt to acquire critical capabilities that conform most closely with Egypt's real-world requirements.
>
> The requested training plan, including an over-reliance of sole-source contractor provided training in CONUS, appears inadequate for a multi-year project of this scope. The OMC recommends an open source LOR that can address all the training requirements, publications, and support at the greatest cost effectiveness for Egypt.
>
> The OMC reiterates its non-concurrence with a procurement of this scope and scale without the USG Program Office's validation of the best solution for Egypt's requirements for a nation-wide maritime domain awareness capability.

*Id.* at AR100378.

Despite OMC's non-concurrence, Egypt proceeded with the 2019 LOR and its sole source request. *Id.* at AR100682. Upon receipt of the 2019 LOR, the Naval Information Warfare Systems Command ("NAVWAR"), International Command, Control, Communications, Computers, and Intelligence Integration Program Office ("PMW 740") of the Navy International Programs Office ("NIPO"), was assigned as the implementing agency for Egypt's request. *See id.* at AR100445-51, AR101686; *see also* ECF No. 67 at 8 n.5.

### C.    The Navy's Intake of the 2019 LOR and the Resulting 2021 LOA

The Navy began seeking information about ATSC's NMSS to respond to Egypt's 2019 LOR.  *See* ECF No. 56-1 at AR100445-46.  ATSC agreed to provide PMW 740 with high-level Bills of Materials, data specifications for unmanned aerial vehicles ("UAVs"), an Operational View ("OV-1"),[4] and other technical documents.  ECF No. 56-1 at AR100451.  In February 2020, PMW 740 visited ATSC's Arizona facilities.  *Id.* at AR101401-05.  ATSC shared the following information with PMW 740 before and during PMW 740's visit:

- a "Capabilities Briefing" of the components of ATSC's NMSS, *id.* at AR100452-500,

- an OV-1, *id.* at AR100554,

- a draft master schedule and a draft statement of work for the NMSS, *id.* at AR100791-826,

- various data sheets for the NMSS, *id.* at AR100897-942,

- an "[ * * * ]" presentation, *id.* at AR100944-57,

- briefing presentations for the Arizona site survey, *id.* at AR101412-56, and

- a briefing presentation titled "[ * * * ]," *id.* at AR101538-55.

ATSC marked all these materials as proprietary and confidential.  *Id.* at AR100453-500, AR100550, AR100791-826, AR100897-942, AR100945-56, AR101413-55, AR101538-55.

The Navy also began the process of preparing an LOA based on Egypt's LOR.  *See id.* at AR100743.  Rear Admiral ("RADM") F.D. Morley informed Egypt that, to prepare the LOA, the United States Government would have to conduct "Comprehensive Program and System studies," "Site visits to verify and validate [ATSC's] System details," and "Travel to review the LOA, Line-by-Line, with [Egypt] to ensure all LOR requirements are included."  *Id.* at AR101686-87.  RADM Morley also raised concerns that sole source awards "may result in a higher procurement cost, increase to schedule, or less-than-optimal training plan or program execution than could be achieved through competitive procurement measures."  *See id.* at AR101686.

To proceed with an LOA, the Navy began the multi-level review process.  First, the Navy sought guidance from DSCA and the Department of State.  *Id.* at AR101961.  The Department of State observed the United States Government's "consensus" was "an open-source LOR would be the best option."  *Id.* at AR100743.  Regardless, the Department of State approved the FMS

---

[4] An OV-1 "shows the main operational concepts and interesting or unique aspects of operations."  ECF No. 65 at 17 n.8 (internal quotation marks omitted).

procurement to Egypt. *Id.* at AR102386-87. DSCA then submitted "the required certification notifying Congress of this possible sale." *Id.* at AR102386. Senator Leahy's office placed a hold on the LOA, which was lifted in 2021. ECF No. 56-2 at AR102701-05. Thereafter, Congress did not block the sale to Egypt, so the United States Government extended the LOA to Egypt. *Id.* at AR102713-37.

Egypt executed the LOA on May 26, 2021. *Id.* at AR102713. Note 11 of the LOA is titled "Procurement Using Other Than Full and Open Competition," and states that ATSC would "be designated as prime contractor for . . . this Letter of Offer and Acceptance" and that "a specific source designation has been requested in writing by the Purchaser and that the Department of Defense has accepted the request." *Id.* at AR102720. Further, the LOA provides that it is "subject to U.S. law and regulation, including U.S. procurement law." *Id.* at AR102732.

### D.    The Site Survey and Debriefing

After execution of the LOA, PMW 740 began working with ATSC to fulfill Egypt's FMS request by exchanging preparatory materials and planning a site survey. *Id.* at AR102882-925, AR102985-3025, AR103078-96, AR103142-56. In preparation for the site survey, ATSC sent PMW 740 an estimate $[ * * * ] million Rough Order of Magnitude and an Integrated Master Schedule. *Id.* at AR103202-05, AR103208-09. Petra Pagan, the PMW 740 case manager, requested additional information about the cost of the site survey. *Id.* at AR103215-17, AR103224. In response, ATSC provided additional details and reduced its price by $[ * * * ] to $[ * * * ] million. *Id.* at AR103223-42. Based on the estimated cost, PMW 740 decided to conduct the site survey without ATSC. *Id.* at AR103258, AR103293. Prior to the site survey, Ms. Pagan sent other Navy personnel an email stating the attachment contains "sensitive information . . . provided by the sole source company [ATSC]" and attached slides from ATSC's "[ * * * ]" briefing with ATSC's proprietary and confidential markings removed. *Id.* at AR103326-43; ECF No. 56-10 at AR118874.

PMW 740 conducted the site survey in November and December 2021. ECF No. 56-2 at AR103353-71. Following the site survey, Ms. Pagan, on behalf of PMW 740, provided Egypt with a debriefing presentation on December 15, 2021. *Id.* at AR103372-437. The presentation recommended that Egypt "Reconsider NOT going Sole Source" for various reasons:

- the system recommended by the Sole Source company [ATSC] does NOT provide a system that meets all cyber security requirements nor does it provide future growth of system for Egypt[,]

- Cost for the Sole Source is much higher then [sic] open competition[,]

- Sole Source is NOT providing a total package approach[,]

- Sole Source is not faster it is actually slower and locks the customer, in this case, Egypt into a less flexible contract[,]

- Egypt will pay more money with Sole Source as oppose[d]
  to open competition[, and]

- Sole Source: Contracts are very difficult and do not provide
  flexibility[.]

*Id.* at AR103429 (emphasis omitted).  Further, the presentation recommended Egypt use "Open Competition . . . that will provide a more effective, future growth, meet cyber security and deliver a total package."  *Id.* at AR103432.

On December 27, 2021, Ms. Pagan sent a list of twenty-one points to Egypt to justify why "Egypt should go open competition NOT sole source," including the following points:

> 2. Cost of Sole source of $[ * * * ] million will increase and they will increase all parts of the efforts.  Why?  Because they will say time it has taken for the effort to move forward, but if they really were honest it would not cost more money.

> 3. Cost of $[ * * * ]M, I cannot justify from their submission as per attachment.  Sole Source vendor will not provide break down of cost per line.  I requested this information when I was developing the LOA and they refused.  I know from my own research of cost for the materiel they have recommend that the vendor has added engineering cost make the over cost for each lines of the requirements much more expensive than required.

> . . .

> 5. Sole Source vendor, ATSC, is a pass thru only they do not have the skill sets required to execute this effort.  They will have to outsource all the efforts just to be able to complete the effort!

> . . .

> 9. ATSC has improved already that they will not be flexible to meet Egypt requirements.  USG has had discussion with ATSC and they do not want to be flexible as you can see from their price quote for site survey.

ECF No. 56-9 at AR117386-87 (emphasis omitted).  Then, on January 4, 2022, Ms. Pagan sent an email to Egypt with a draft LOR requesting an amended LOA requesting open competition. ECF No. 56-2 at AR103513-16.

### E.    The 2022 LOR and 2022 Amended LOA

Egypt sent an updated LOR on January 25, 2022, to "Remove ATSC as a sole source in the subject FMS case."  *Id.* at AR103891-94.  PMW 740 acknowledged receipt of Egypt's 2022 LOR in a letter sent on February 3, 2022, and the letter mentions that "it is exclusively the

discretion of [Egypt] to rescind the previous sole source direction and to pursue acquisition through full and open competition." *Id.* at AR104034. Egypt responded to PMW 740's letter on March 28, 2022:

> Following a survey by PMW 740 . . . , PMW 740 provided on 27 December 2022 a list of 21 points justifying open competition versus using ATSC as a sole source. Later, on 4 January 2022, PMW 740 provided a draft LOR to amend the Case in this respect. Based on these justifications, the [2022 LOR] was issued . . . by . . . Egypt to remove the sole source . . . .
>
> . . .
>
> [T]he above plan [from PMW 740] indicates that there is no intention to use an open competition for selecting a Prime Contractor who is fully responsible for conceptual/final designs, software development, full integration, testing, and final delivery of a fully operational system that meets the requirements and specifications. It is not clear how these activities will be accomplished.

ECF No. 56-4 at AR105955. Egypt's letter also requests additional information to be provided before the amended LOA. *Id.* at AR105956. In response, the Navy sent additional materials, which confirm PMW 740 would "pursue a full and open acquisition strategy." *Id.* at AR106036.

The Navy and Egypt continued discussions throughout early 2022 leading up to the Navy preparing the amended LOA. *See id.* at AR106154-61. Likewise, NAVWAR began developing a competitive solicitation in spring 2022. *See, e.g.*, ECF No. 56-5 at AR106573-76, AR106584, AR106611-12, AR106625. During the development, PMW 740 Director Richard Rimer asked Ms. Pagan to confirm that "nothing in the reports include graphics, illustrations, or (verbatim) text from anything ATSC provided" because of his concerns about "legal issues." *Id.* at AR106573. Ms. Pagan replied that "[n]one of the documents use any ATSC diagrams or wording at all." *Id.* Following further discussions, the United States Government and Egypt executed the amended LOA on June 8, 2022. *Id.* at AR106900-16. The 2022 amended LOA removes the sole source request. *Id.* at AR106909.

## F.    Inquiries from ATSC and Congress

After Egypt issued its 2022 LOR, ATSC and several Senators sent inquiries to the Navy about the changed procurement method. *See* ECF No. 56-2 at AR103903-04, AR103912-13; ECF No. 56-4 at AR105781, AR105918-19; ECF No. 56-5 at AR107850-52. The first inquiry came from ATSC's CEO Habib Debs. ECF No. 56-2 at AR103903-04. He emailed the Director of NIPO that ATSC understood that the United States Government "changed [its] position vis a vis supporting ATSC's selection as the preferred solution provider." *Id.* The Director responded to Mr. Debs:

> My staff and staff from PMW-740 have been very professional and understand that USG representatives must remain objective in

> providing options or recommendations in response to the partner's requests.
>
> After receiving the GoE's November 13, 2019 Letter of Request (LOR) for Letter of Offer and Acceptance (LOA) that included a sole source request for ATSC, NIPO and PMW-740 worked to develop, offer, implement, and execute the GoE's Foreign Military Sales (FMS) case in accordance with U.S. law and policy, which includes DoD contracting agencies deferring to a foreign purchaser's request for other than full and open competition.  GoE has since submitted an LOR for amendment of the LOA that included direction to remove ATSC as the sole source in the FMS case.
>
> When procuring for a foreign government, DoD applies the same DoD regulations and other applicable USG procedures, in accordance with U.S. law, as it would use in procuring for itself. The competitive procurement process is used to the maximum extent possible to procure defense articles or services, unless the written directions of a foreign government require the use of other than competitive procedures.  We will continue to execute GoE's FMS acquisition in accordance with GoE's requests and U.S. law, regulation, and policy.
>
> Based on current status, we anticipate PMW-740 will issue a Request for Proposals (RFP) and conduct a competitive acquisition . . . .

*Id.* at AR104081-82.  Retired Vice Admiral Adam Landay, an ATSC Advisory Board Member, also sent an inquiry to the Navy about a "letter" from the United States Government recommending another competition for the procurement, and Mr. Debs sent a follow-up email also mentioning a similar "letter" from the Government.  *Id.* at AR103912-13, AR104080-81.

ATSC's inquiries led the Navy to conduct an internal review of Ms. Pagan's actions.  *See* ECF No. 56-3 at AR104128-32.  The internal review discovered that PMW 740 "did indeed recommend other than sole source to Egypt during the out-brief in later December 2021, following the site survey."  *Id.* at AR104129.  Suzanne Arney, the PMW 740 Program Manager, mentioned Ms. Pagan "understands the boundary we overstepped," although Ms. Arney "believe[d] it was truly unintentional on [Ms. Pagan's] part and she was trying to respond to Egypt's request for her recommendation and questions regarding options."  *Id.* at AR104128. Following the Navy's internal inquiry, Ms. Arney replied to Mr. Debs regarding his and Adm. Landay's emails that "[t]he results of [ * * * ]," so Egypt sent the 2022 LOR "requesting amendment of the LOA . . . and included direction to change contract strategy from sole source to full and open competition."  *Id.* at AR104197.

ATSC also spurred several congressional inquiries into the switch from a sole source request to full and open competition.  *See* ECF No. 65 at 35; ECF No. 67 at 18.  Senator Kaine's

office requested "additional insight" to "better identify the issue with ATSC" that lead the PMW 740 case manager to "allegedly reach[] out to their Egyptian counterpart after the letter of agreement had been signed, advising Egypt to seek a reversal of their sole source selection of ATSC." ECF No. 56-4 at AR105781. In response to this inquiry, Ms. Arney said the PMW 740 case manager did not reach out to Egypt to seek a reversal of the sole source selection, and PMW 740 did not "question ATSC's ability to perform the work." ECF No. 23-3 at AR3561. Ms. Arney explained "[t]he PMW 740 program office did not actively pursue reversal of the sole source strategy, [ * * * ]." *Id.* Ms. Arney also included a timeline that noted the case manager "recommended competitive procurement" in December 2021. *Id.* at AR3559-60.

Senator Shaheen's office also contacted PMW 740 about the change from a sole source to full and open competition with a series of questions. ECF No. 56-4 at AR105918-19. The questions and PMW 740's responses are listed below:

> 1. Can the Navy offer insight on how the change in requirements and contracting process came to be after the Egyptian government had already made a sole source selection? [Response:] From inception of case EG-PLGQ, final requirements definition was subject to the results of a comprehensive site survey. In June 2021, Egypt requested the USG to revisit requirements, explore alternative acquisition strategies and expressed concern over costs in general. The in-country site survey was conducted by PMW 740 in NOV/DEC 2021, with participation of Egyptian Navy representatives. The PMW 740 Case Manager outbriefed the results of the site survey to Egyptian Navy senior leaders, and provided USG recommendations, at the request of Egypt. During the out-brief Egypt stated their intent to fund some elements of the system (i.e., towers) using national funds. Considering the requirements changes, availability of suitable commercial components, and lifecycle considerations, the Case Manager assessed risk regarding the proposed acquisition strategy and recommended competitive procurement for a total package approach.

> 2. How the requirement for the contract came to change to require the chosen company to fully manufacture and assemble all parts of the system and whether that is an appropriate requirement given how that would disadvantage small businesses like Clear Align? [Response:] On January 25, 2022, the Egyptian Procurement Office submitted an amendment to EG-P-LGQ to the US Office of Military Cooperation (OMC) Egypt, requesting removal of sole source, and revising case line-items to be "requirements-defined" instead of "material-defined." As a result, in accordance with the terms and conditions of the amended Letter of Offer and Acceptance (LOA), PMW 740 is pursuing an acquisition strategy focused on full and open competition to acquire Egypt's NMSS. PMW 740 has not released a revised Request for Proposal. There

is no intent nor justification to "require the chosen company to fully manufacture and assemble all parts of the system". Neither ATSC nor Clear Align are precluded or disqualified from submitting a proposal.

3. What role representatives in the Navy played in advising the Egyptian government on technical aspects of industry products to meet their requirements? [Response:] PMW 740's role is to address partner nation requirements and deliver Command Control, Communications, Computers and Intelligence (C4I) capabilities, aligned to U.S. national strategy and in coordination with the Office of Military Cooperation, Egypt. We undertake acquisition and procurement efforts to meet partner nation requirements in accordance with the terms and conditions of Egypt's LOA. We do not recommend specific companies or products. We are pursuing a strategy of full and open competition in accordance with US procurement law to deliver the best solution possible, within cost, schedule and performance constraints, to meet Egypt's NMSS requirement.

*Id.* Further, PMW 740 provided a timeline that acknowledged the case manager "recommended competitive procurement." *Id.* at AR105926-27.

PMW 740 also provided a congressional briefing in response to inquiries from several Senators. ECF No. 56-5 at AR107570-77. The congressional briefing mentions the case manager "recommended competitive procurement for Egypt's consideration" after the 2021 site survey. *Id.* at AR107574.

The last inquiry came from Senators Shaheen, Hassan, Kaine, and Warner in a letter to Secretary of the Navy Carlos Del Toro. *Id.* at AR107850-52. The letter contains the following questions, among others:

1. What is the U.S. Navy's basis for recommending to Egypt a deviation from the source requested by the FMS Customer and approved by the Department of Defense, as notified to Congress (attached)?

a. What evaluation was made that the approved sole source provider was not able to support Egypt's proposed changes? Who was the final U.S. decision authority to recommend the deviation from the approved U.S. Government position?

b. When Egypt shared its intent to procure some elements of the system (i.e., towers) with national funds, did the U.S. Navy provide that information to the designated and approved sole source provider (ATSC) for them to update

their proposed solution before the Navy recommended a deviation from the approved acquisition strategy? If not, why not?

2. In presenting this to the Egyptian Government, did any individuals with the U.S. Navy represent this recommendation to be the position of the United States Government? Was this recommendation documented in writing?

3. The Security Assistance Management Manual (SAMM) encourages deference to requests by FMS customers for specified sources, and deviation from the SAMM requires approval from the Defense Security Cooperation Agency (DSCA) Director [DOD 5105.38–M at 2 (Foreword), C6.3.4.3 (Policy Requirements)].

    a. Did the Director of the DSCA approve a deviation from the source designation identified by the FMS Customer and approved by the Department of Defense prior to the case manager making that recommendation to the FMS Customer? If so, on what basis?

    b. If not, how has the recommendation provided by the case manager to deviate from the request of the Egyptian FMS Customer (which had been approved by the Department of Defense) complied with SAMM policy?

ECF No. 56-5 at AR107851. Secretary Del Toro's response states the following:

[T]he U.S. Navy did not recommend a deviation from the source requested by the FMS customer; however, in January 2022 Egypt sent an LOR Amendment requesting a full and open competition, as well as changes to case line items identified in the site survey findings. Because the U.S. Navy did not deviate from the requests of the FMS customer, no deviation or disapproval occurred requiring approval by the Director, Defense Security Cooperation Agency.[5]

---

[5] PMW 740 helped Secretary Del Toro develop his response letter. *See* ECF No. 56-5 at AR108383, AR108385. ATSC argues PMW 740's influence resulted in Secretary Del Toro's letter containing "false statements." ECF No. 65 at 41; ECF No. 69 at 14-15. As the Government highlights, PMW 740's draft letter includes the following: "the U.S. Navy team recommended a full and open competition acquisition approach for Egypt's consideration." ECF No. 56-5 at AR108385; ECF No. 67 at 21. Thus, PMW 740 did not draft the letter to hide Ms. Pagan's actions. Additionally, the Government explains that a "deviation" from the request of a foreign government in an FMS case occurs when the United States rejects a sole source request. *See* ECF No. 67 at 67. Here, the Navy did not reject Egypt's sole source request, so it did not

ECF No. 56-5 at AR107969. Secretary Del Toro's letter also notes the Navy was going to assign the competitive procurement to a different Navy activity "[o]ut of an abundance of caution." *Id.*

### G.    The Development and Issuance of the Present Solicitation

The Navy transferred the FMS procurement for Egypt from NAVWAR to Naval Sea Systems Command ("NAVSEA"). *Id.* at AR108479. NAVSEA issued a pre-solicitation for a "NMSS" system for Egypt on December 21, 2022. *Id.* at AR108896-902. To receive controlled unclassified information ("CUI") for the upcoming solicitation, interested offerors were instructed to execute and submit a terms of use agreement and other information. *Id.* at AR108897, AR108900-02. ATSC submitted the requested information and received the CUI. *Id.* at AR108987. The CUI provides the minimum requirements for the NMSS. *Id.* at AR108490-91. On February 2, 2023, NAVSEA issued the solicitation as a competitive request for proposals. ECF No. 56-6 at AR109871-992. The solicitation sought a "Nationwide Maritime Surveillance System (NMSS) for the Egyptian Navy (EN)." *Id.* at AR109988.

On March 19, 2023, ATSC sent NAVSEA a letter asserting that the solicitation and its attachments "contain[] significant information that is proprietary to Advanced Technology Systems Company." ECF No. 56-7 at AR111402-07. Specifically, ATSC's letter claims:

> [T]he seventy-two (72) items in the list that are contained in the NAVSEA Solicitation, [ * * * ] are identical or substantially identical to items/information that are proprietary to ATSC, [ * * * ] are substantially or significantly similar to items/information that are proprietary to ATSC, and only [ * * * ] are different from items/information contained in the proprietary ATSC NMSS. Further, whole provisions of the NAVSEA Solicitation are identical or nearly identical to provisions contained in the ATSC proprietary NMSS solution provided to the Navy. Even the name 'Nationwide Maritime Surveillance System' was developed by ATSC.

*Id.* at AR111404. As a result, the letter claims the Navy violated federal law by issuing a solicitation based on ATSC's proprietary information. *Id.* at AR111406.

In response, NAVSEA conducted an inquiry, and the NAVSEA contracting officer issued a procurement impact determination. ECF No. 56-8 at AR115180-91. The NAVSEA contracting officer concluded "there is no support for the allegation that the U.S. Navy knowingly disclosed or obtained any contractor bid or proposal information, nor did it misuse company proprietary information in the development of this solicitation," so the contracting officer recommended that "the Government proceed with" the solicitation. *Id.* at AR115191. The Navy accepted that recommendation and proceeded with the solicitation. *Id.* at AR115192.

---

"deviate" from Egypt's request. *See id.* Thus, the court disagrees that Secretary Del Toro's letter is "demonstrably false," as ATSC argues, ECF No. 65 at 41. *See* ECF No. 67 at 67.

## II.    Procedural History

ATSC filed this pre-award bid protest on June 29, 2023.  ECF No. 1.  The Complaint brings claims under (1) the fundamental fairness provisions of the FAR, (2) the Procurement Integrity Act ("PIA"), (3) trade secrets law and FAR 3.104-4(d)(3), and (4) the Fifth Amendment Takings Clause.  ECF No. 15 at ¶¶ 123-58.

### A.    ATSC's Motion to Complete the Administrative Record

The Government filed the administrative record on July 24, 2023.  ECF No. 23.  A few days later, ATSC moved to complete the administrative record with the following four groups of documents:

> (1) ATSC's proposal materials submitted to the Egyptian Navy for ATSC's [NMSS];
>
> (2) all communications between the Government of Egypt and the United States related to ATSC's NMSS solution and/or the subject procurement following Egypt's [2019 LOR] for a sole-source award to ATSC for its NMSS . . . ;
>
> (3) all documents and communications related to the Navy's consideration of ATSC's NMSS . . . following Egypt's issuance of the LOR; and
>
> (4) all documents [the Government] is currently withholding, or has redacted, pursuant to the deliberative process privilege, where [the Government]'s invocation of the privilege is procedurally deficient, such that neither ATSC nor the Court has any means to consider the merits of the invocation.

ECF No. 24 at 1-2.  The court granted-in-part and denied-in-part ATSC's motion.  *Advanced Tech. Sys. Co. v. United States*, No. 23-1000, 2023 WL 8805707 (Fed. Cl. Oct. 4, 2023).  First, the court denied ATSC's motion with respect to ATSC's proposal materials submitted to Egypt.  *Id.* at *3-4.  Second, the court decided ATSC's request for all documents reflecting communications between Egypt and the Navy was overbroad, but the court granted-in-part ATSC's second request with respect to "communications between the Navy and Egypt about whether to compete this procurement as sole source or through full-and-open competition, and communications about Egypt's NMSS requirements."  *Id.* at *5.  Third, the court granted ATSC's motion to complete the administrative record with "all documents and materials provided to the Navy at its request by ATSC about the NMSS."  *Id.* at *6.  Fourth, the court denied in part ATSC's request for the materials withheld under the deliberative process privilege, but required the Government to provide a compliant privilege log.  *Id.* at *7.

### B.    The Remand to the Navy

After gathering additional documents in response to the court's order, the Navy moved to remand the case to the Navy to "reconsider the agency decision challenged by [ATSC], namely

the choice to proceed with full and open competition in the solicitation at issue." ECF No. 45 at 1. The court granted the Navy's motion on March 20, 2024. ECF No. 49. On remand, the Navy re-evaluated whether its decision to proceed with full and open competition was consistent with the FAR's fundamental fairness provisions and the PIA. *See id.* at 2-3; ECF No. 56-10 at AR118858.

The remand resulted in two new memoranda from the Navy on May 20, 2024. ECF No. 56-10 at AR118854-81. With respect to fundamental fairness, the supervisory contracting specialist determined the Navy comported with fundamental fairness. *Id.* at AR118858. The Navy did not violate fundamental fairness because "[a]lthough USG representatives recommended to [Egypt] that its requirements be fulfilled through full and open competition, rather than the previously requested and agreed to sole source contract to ATSC, Egypt ultimately submitted a LOR to amend the LOA, and executed LOA Amendment 1," and "the decision of how to procure the requirement ultimately resides with [Egypt], which elected to change course." *Id.*

With respect to the PIA, the contracting officer concluded that: (1) the solicitation did not use or rely on ATSC's "cost or pricing data," "indirect costs and direct labor rates," "proprietary information about manufacturing processes, operations, or techniques marked by the contractor in accordance with applicable law or regulation," or "information marked in accordance with" FAR 52.215-1(e); (2) the Government never received any "information marked by the contractor as 'contractor bid or proposal information' in accordance with applicable law or regulation"; (3) PMW 740 violated the PIA when Ms. Pagan shared a version of ATSC's "[ * * * ]" with its proprietary markings removed, but the information was not shared outside of the Government, so it had no impact on the procurement to raise a PIA claim. *Id.* at AR118870-74.

The contracting officer also reviewed the record for a violation of trade secrets law and decided that no violation occurred because the solicitation requirements were "developed based on the LOR and LOA Amendment 1," and ATSC claimed protection over "generally known industry standards and publicly available information." *Id.* at AR118876-79.

## C.    The Present Motion and Cross-Motion

ATSC filed its Motion for Judgment on the Administrative Record on August 14, 2024. ECF No. 65. ATSC argues (1) the Navy violated the FAR's fundamental fairness provisions when it recommended Egypt remove its sole source request, and the fundamental fairness memorandum to the contrary is irrational and does not merit deference; (2) the Navy violated the PIA and trade secrets law when it disclosed ATSC's proprietary information in the underlying solicitation, and the PIA memorandum to the contrary is irrational; and (3) the Navy's disclosure of ATSC's proprietary information also gives rise to a Fifth Amendment Takings Clause claim. *Id.* at 44-60. ATSC seeks injunctive relief to address its claims. *Id.* at 61-65.

The Government filed its Cross-Motion for Judgment on the Administrative Record on September 11, 2024. ECF No. 67. The Government argues (1) the FAR's fundamental fairness provisions do not give rise to a private right of action, but even if a right exists, the fundamental fairness memorandum is rational; (2) ATSC's PIA claim is barred by the statute of limitations; (3) even if ATSC's PIA claim is not barred, its information does not fall under the protection of

the PIA, and the PIA memorandum is rational; (4) the court lacks jurisdiction over ATSC's trade secrets claim, but even if it could review the trade secrets claim, the contracting officer's conclusion was rational; (5) injunctive relief is not available for ATSC's takings claim; and (6) ATSC is not entitled to injunctive relief on its claims. *Id.* at 32-74.  Notably, the Government's Reply filed on October 3, 2024, raises several jurisdictional arguments for the first time: (1) the court lacks jurisdiction over ATSC's fundamental fairness claim because of treaty preclusion, (2) ATSC's fundamental fairness claim presents a non-justiciable political question and implicates the act of state doctrine, and (3) 28 U.S.C. § 2356 prescribes that monetary relief is the exclusive remedy for ATSC's claims of disclosure of proprietary information in the FMS context.  ECF No. 72 at 3-10.  Accordingly, the court granted ATSC leave to file a sur-reply to address those new arguments.  ECF No. 74.  ATSC filed its sur-reply on October 7, 2024, ECF No. 76, and the court held oral argument the following day.  The underlying motions are thus fully briefed and ripe for disposition.

### III.    Jurisdiction and Standard of Review

This court has jurisdiction over pre-award protests pursuant to 28 U.S.C. § 1491(b)(1). When deciding a pre-award protest, the court applies the standard of review applicable under the Administrative Procedure Act, 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Thus, the court is typically called upon to set aside a procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285 (Fed. Cir. 2010) (citation omitted).  And in reviewing the agency action, the court does not substitute its judgment for that of the agency; rather, the court considers whether the agency considered the relevant factors and provided a rational basis for its decision.  *See, e.g.*, *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

The protestor must also establish that it was prejudiced by the agency's action.  5 U.S.C. § 706; *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) ("To prevail in a bid protest case, the protestor must show that it was prejudiced by the government's actions.").  In a pre-award protest such as this, the protestor must show that it suffered "a non-trivial competitive injury which can be addressed by judicial relief."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009) (internal quotation marks omitted) (citation omitted).  Because there is no presumption of prejudice, it is not enough for the protestor merely to establish the irrationality of an agency decision.  *E.g.*, *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 131 (2022), *aff'd*, 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023).

### IV.    ATSC's Fundamental Fairness Claims.

ATSC claims the Navy's conduct violated the fundamental fairness provisions in the FAR, 48 C.F.R. §§ 1.102-2, 1.602-2, 3.101-1.  ECF No. 65 at 44.  This claim focuses primarily on the following materials that Ms. Pagan sent to Egypt:

- a December 16, 2021, site survey briefing presentation recommending Egypt reconsider its sole source request,

ECF No. 56-2 at AR103372, AR103429-33; ECF No. 65 at 26;

- a December 27, 2021, email containing twenty-one reasons why Egypt should reconsider its sole source request, ECF No. 56-2 at AR117386-88; ECF No. 65 at 4-7, 26; and

- a January 4, 2022, email including a drafted LOR that requests an amended LOA requesting full and open competition, ECF No. 56-2 at AR103513-16; *see* ECF No. 65 at 27, 45-46.

Following Ms. Pagan's actions, Egypt sent NIPO an LOR requesting the removal of its sole source request and later executed an amended LOA that removed the sole source request. ECF No. 56-2 at AR103891-94; ECF No. 56-5 at AR106900-16; *see* ECF No. 67 at 16-18. Thus, ATSC claims the Navy "lobbied ENAD to rescind its request for a sole-source award to ATSC by impugning ATSC's integrity and capability," resulting in the switch from a sole source award to ATSC to full and open competition in the present solicitation.[6]  *See* ECF No. 65 at 11, 44-45; ECF No. 69 at 11-15; *see also* ECF No. 56-10 at AR118855-58.

This fundamental fairness claim raises numerous issues.  This claim may implicate treaty preclusion under 28 U.S.C. § 1502 if the LOAs constitute treaties under that section and ATSC's claim arises from those treaties.  ECF No. 72 at 6-8.  Similarly, there is an apparent split of authority on the question of whether a plaintiff can bring an action under 48 C.F.R. §§ 1.102-2, 1.602-2, or 3.101-1.  *Compare SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 664 (2021), *aff'd*, No. 2021-2279, 2023 WL 6632915 (Fed. Cir. Oct. 12, 2023) (deciding the contracting officer violated 48 C.F.R. §§ 1.102-2, 1.602-2, 3.101-1), *with Harmonia Holdings Grp., LLC v. United States*, 145 Fed. Cl. 84, 91 (2019) ("While the government should always strive to act accordingly, it is well established that FAR 1.102-2(c) is not a source of any judicially enforceable right."); *see also Ceres Env't Servs., Inc. v. United States*, 158 Fed. Cl. 547, 565-66 (2022) (collecting cases on each side of the split regarding a private right of action under 48 C.F.R. § 1.102-2); *MORI Associates, Inc. v. United States*, 102 Fed. Cl. 503, 524-25 (2011) (deciding 48 C.F.R. §§ 1.602-2, 3.101-1 provide enforceable rights); *AT&T Co. v. United States*, 307 F.3d 1374, 1380 (Fed. Cir. 2002) ("[C]autionary and informative regulations and directives provide only internal governmental direction. . . . [T]hese provisions supply no remedy for private parties in a judicial forum."); *INSLAW, Inc. v. United States*, 40 Fed. Cl. 843, 858-59 (1998) (deciding 48 C.F.R. § 3.101-1 protects the "integrity of the government procurement process" and does not give individual contractors enforceable rights).  On the merits, the court

---

[6] After Egypt executed the 2022 LOR, ATSC and several Senators sent inquiries into the change from a sole source award to ATSC.  *See supra* Section I.F.  ATSC argues the Navy's responses to these inquiries conceal the Navy's conduct, i.e., lobbying for a change from a sole source award.  ECF No. 65 at 46-48; ECF No. 69 at 12-15.  Like the Government, the court does not understand ATSC to "assert that the communications themselves give rise to a protest cause of action," *see* ECF No. 67 at 64, but these communications further underscore ATSC's claim that the Navy's conduct was unfair.

would need to decide whether ATSC would have to show bad faith in the Navy's conduct—which ATSC characterizes as "lobbying," and the Government characterizes as "recommending"—to prevail on its claim that the Navy violated the FAR's fundamental fairness provisions. *See Ceres Env't Servs.*, 158 Fed. Cl. at 566 (declining to resolve whether the arbitrary and capricious standard or clear and convincing evidence bad faith standard applies); *BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 506 (2012) ("If this court had jurisdiction over plaintiff's fairness challenge . . . the only logical standard of review . . . is whether the State Department has acted in bad faith."); *FFTF Restorations Co. v. United States*, 86 Fed. Cl. 226, 245 (2009) (applying rational basis review to claims brought under 48 C.F.R. § 1.102-2).

In the end, the court need not resolve all these issues for two simple reasons. First, even if treaty preclusion under 28 U.S.C. § 1502 does not remove this court's jurisdiction over ATSC's fundamental fairness claim, there is no injunctive relief that this court may award. Second, even if this court could grant injunctive relief, the court would not exercise its discretion to do so in this case given the international relations and national security concerns.

## A.     The Court Cannot Grant the Injunctive Relief that ATSC Seeks.

ATSC requests the court enter an injunction ordering the Navy to set-aside the Navy's conversion of this procurement from a sole source award to ATSC into a full and open competition.[7] ECF No. 65 at 61, 63-65; ECF No. 69 at 28-30. The court cannot order the Navy to cancel its present competitive solicitation and to reinstate the sole source award to ATSC because such an order would force the Government to ignore the terms of the 2022 LOA and CICA.

The terms of the 2022 LOA state that it is "subject to U.S. law and regulation, including U.S. procurement law." ECF No. 56-9 at AR117149, AR117168; ECF No. 67 at 15; *see* 48 C.F.R. § 225.7301(b) (directing the Government to "[c]onduct FMS acquisitions under the same acquisition and contract management procedures used for other defense acquisitions"); SAMM § C6.3.1 ("Acquisition for [FMS] purchasers must be in accordance with DoD regulations and other applicable USG procedures."). Under U.S. law, this procurement must use full and open competition.

In general, CICA requires the government to "obtain full and open competition through the use of competitive procedures" when conducting procurements. 10 U.S.C. § 3201(a)(1)[8]; *see also* 48 C.F.R. § 6.101(a) ("10 U.S.C. § 3201 . . . require[s], with certain limited exceptions . . . , that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contracts."). CICA's default rule mandating full and open

---

[7] ATSC alternatively suggests that the court remand this case to the Navy and instruct the Navy to reopen discussions with Egypt about a sole source award. ECF No. 15 Prayer for Relief ¶ 6. Such alternative injunctive relief raises the same concerns discussed with respect to ordering the Navy to return this procurement to sole source.

[8] Because this is a defense procurement, the court applies the codification of the competition requirements in Title 10, while similar requirements applying to other acquisitions are codified in Title 41.

competition is subject to several exceptions.  10 U.S.C. §§ 3201(a), 3204(a).  One such exception—the international agreement exception—allows for the use of "procedures other than competitive procedures" when the following conditions apply:

> [T]he terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures.

10 U.S.C. § 3204(a)(4).  To implement this exception, FAR 6.302-4 provides the international agreement exception applies in several circumstances, including "[w]hen a contemplated acquisition is to be reimbursed by a foreign country that requires that the product be obtained from a particular firm as specified in official written direction such as a Letter of Offer and Acceptance."  48 C.F.R. § 6.302-4(b)(1).  This applies to Egypt, which is reimbursing the United States for the cost of the procurement using a credit that Egypt has with the United States Government.  *See* ECF No. 67 at 6; 48 C.F.R. § 225.7304(a) ("FMS customers may request that a defense article or defense service be obtained from a particular contractor.  In such cases, FAR 6.302–4 provides authority to contract without full and open competition.").  Further, in the FMS program context, no "justifications or approvals" are required "if the head of the contracting activity prepares a document that describes the terms of an agreement or treaty or the written directions, such as a Letter of Offer and Acceptance, that have the effect of requiring the use of other than competitive procedures for the acquisition."  48 C.F.R. § 206.302-4(c).

    In this case, the international agreement exception allowed the Navy to proceed with a sole source award to ATSC under the terms of the 2019 LOR and 2021 LOA.  *See L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 291 (2011) (upholding a sole source award requested by Egypt in its LOA under the international agreement exception in 10 U.S.C. § 2304(c)(4)); *Hyperion, Inc. v. United States*, 120 Fed. Cl. 504, 514 (2015) (upholding a sole source award requested by Jordan under the international agreement exception in 10 U.S.C. § 2304(c)(4)); *Vectrus Servs. A/S v. United States*, 164 Fed. Cl. 693, 792 (2023) (concluding various international agreements and communications justified eligibility limitations in a solicitation for services at Thule Air Base in Greenland).  And if those documents were still the operative documents, neither the court nor the Navy would have any problem with the Navy proceeding with a sole source award (recall that the Navy approved the sole source award when Egypt requested it).  *See* ECF No. 56-1 at AR102386-87; ECF No. 56-2 at AR102713-37.  But they are not the operative documents.

    The operative agreement between the United States and Egypt is the 2022 LOA, which no longer contains the sole source request.  Therefore, this procurement no longer falls under the purview of the international agreement exception because Egypt is no longer requesting a sole source award to ATSC.  Because the international agreement exception no longer applies, CICA *requires* the Navy to conduct the procurement using full and open competition.  The court cannot order the Government to forego full and open competition and reinstate a sole source award to ATSC because such an order would force the Government to either alter the terms of the 2022 LOA or ignore CICA.  The court will order neither.

Nor will the court inquire into Egypt's justification for amending the LOA in 2022. Under this court's bid protest jurisdiction, the court can review actions by the United States, but not actions by foreign governments. *See* 28 U.S.C. § 1491(b)(1), (4) (describing the court's jurisdiction over actions by federal agencies); *see also Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1047 (9th Cir. 1983); *cf. L-3 Commc'ns Corp.*, 99 Fed. Cl. at 297 (questioning whether organizational conflicts of interest rules apply when a foreign government makes the challenged decision). As the Ninth Circuit explained in *Northrop*, "American courts will not resolve issues requiring 'inquiries . . . into the authenticity and motivation of the acts of foreign sovereigns.'" *Northrop Corp.*, 705 F.2d at 1047 (alteration in original) (quoting *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F. Supp. 92, 110 (C.D. Cal. 1971), *aff'd*, 461 F.2d 1261 (9th Cir. 1972)).

Less than three months ago, another member of this court refused to inquire into the justification for a foreign government's licensing requirements for contractors in *Associated Energy Group v. United States*, 172 Fed. Cl. 799 (2024). There, the court stated it did not have "statutory authority or inherent power to require the Djiboutian government to" act and approve certain contractors or waive its licensing requirements for certain contractors. *Id.* at 813. Likewise, the court could not compel the United States government to ignore the Djiboutian government's licensing requirements in awarding a contract. *Id.* at 813-14. Thus, the government acted rationally when it issued a solicitation implementing the Djiboutian government's licensing requirements, although those requirements precluded an award to the plaintiff. *Id.* at 814-16.

Here, Egypt removed its sole source request in the 2022 LOA. *See* ECF No. 56-5 at AR106909. Although ATSC argues the Navy's conduct caused Egypt to remove the sole source request, ECF No. 65 at 44-46; ECF No. 69 at 9-12, Egypt—not the Navy—removed the request for the sole source award to ATSC. Egypt sent the Navy an LOR in January 2022 removing its sole source request. ECF No. 56-2 at AR103891-94. In response, PMW 740 informed Egypt that "it is exclusively the discretion of [Egypt] to rescind the previous sole source direction and to pursue acquisition through full and open competition." *Id.* at AR104034. Egypt's reply letter to PMW 740 confirms it removed its sole source request. ECF No. 56-4 at AR105955. By June 2022, Egypt executed the amended LOA that removes the sole source request. ECF No. 56-5 at AR106909. The court cannot inquire into the justification for Egypt's change just like the court did not inquire into the reasons behind the Djiboutian government's licensing requirements. *See Associated Energy Grp.*, 172 Fed. Cl. at 813. Thus, Egypt's justification for removing its sole source request is beyond the court's review.

Accordingly, the court cannot reinstate a sole source award as ATSC requests because such relief would require this court to order Egypt to alter the terms of the 2022 LOA (which is clearly beyond this court's authority) or require the Navy to ignore CICA. Because ATSC has not identified any other CICA exception that might allow a sole source award, the court cannot order the Navy to award a sole source contract to ATSC.

### B.    ATSC is not Entitled to Injunctive Relief on its Fundamental Fairness Claim.

Even if the court could grant the injunctive relief that ATSC seeks, the court would not do so in this case. In bid protests, this court may "award any relief that the court considers

proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2). This court retains "equitable discretion in deciding whether injunctive relief is appropriate" in bid protest cases even when the plaintiff prevails on the merits. *PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004). To exercise this discretion, the court considers whether: (1) the plaintiff succeeded on the merits, (2) the plaintiff will suffer irreparable harm without injunctive relief, (3) the balance of hardships to the parties favors granting injunctive relief, and (4) injunctive relief is in the public interest. *Centech Grp. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *PGBA, LLC*, 389 F.3d at 1228-29. The court also "shall give due regard to the interests of national defense and national security" in exercising its equitable discretion. 28 U.S.C. § 1491(b)(3); *DataPath, Inc. v. United States*, 87 Fed. Cl. 162, 166 (2009) ("Congress has recognized that, under certain circumstances, a protestor's right to contest a government procurement must give way. Accordingly, [this court] must 'give due regard to the interests of national defense and national security . . . .'") (quoting 28 U.S.C. § 1491(b)(3)).

Even assuming ATSC prevails on the merits, national security concerns underlying this case weigh against the court granting injunctive relief. An FMS procurement cannot occur unless "the President finds that the furnishing of defense articles and defense services to such country . . . will strengthen the security of the United States." 22 U.S.C. § 2753(a)(1); *see also* 22 U.S.C. § 2751 ("It is the sense of the Congress . . . that, in implementing this policy worldwide, a balanced approach should be taken and full regard given to the security interests of the United States . . . ."). As the Government highlights, "the State Department has approved the sale . . . to Egypt, and Congress was formally notified of the sale[, and] Congress was then informed of the potential amendment." ECF No. 67 at 73. And the Navy responded to multiple inquiries from members of Congress. *See supra* Section I.F. In other words, both branches of the federal government that the Constitution vests with foreign relations powers are informed about this procurement and have not objected. *See* U.S. Const. art. I, § 8; U.S. Const. art. II, § 2; *see also* ECF No. 72 at 19. Accordingly, this court should tread lightly. Given the lack of objection from Congress after it learned of the Navy's recommendations to Egypt, this court would not enter the injunction ATSC seeks even if this court had the authority to do so.

## V.    Section 2356 Precludes Injunctive Relief for ATSC's Disclosure Claims.

ATSC also seeks injunctive relief for several claims related to the Navy's alleged use and disclosure of ATSC's proprietary information in the pending solicitation. ECF No. 65 at 49, 59, 61. The Navy gained access to ATSC's proprietary information when it sought to learn about ATSC's NMSS proposal in response to Egypt's 2019 LOR requesting a sole source award to ATSC for its NMSS. *See* ECF No. 56-1 at AR100452-500, AR100550, AR100791-826, AR100897-942, AR100944-57, AR101412-56, AR101538-55; ECF No. 56-10 at AR118862-63, AR11869; ECF No. 65 at 17, 19-21, 50, 54, 56; ECF No. 67 at 13-14; ECF No. 69 at 21-22. In 2022, Egypt removed its sole source request in the amended LOA, which lead the Navy to develop the pending competitive procurement solicitation. *See* ECF No. 56-5 at AR106573-76, AR106584, AR106611-12, AR106625, AR106909; ECF No. 67 at 17, 21-22. According to ATSC, the Navy used ATSC's proprietary information to develop the solicitation, and the Navy disclosed that information without authorization to ATSC's competitors when the Navy issued the solicitation. ECF No. 65 at 50-56. That unauthorized disclosure is the basis for ATSC's claims under the PIA, 41 U.S.C. § 2102, trade secrets law, and the Fifth Amendment's Takings

Clause.  *See* ECF No. 65 at 49-50, 56-57, 59; ECF No. 69 at 21-22, 25-26.  The court refers to these claims collectively as ATSC's "disclosure claims."

The Government argues this court cannot grant injunctive relief for any of ATSC's disclosure claims because 22 U.S.C. § 2356 permits only monetary relief for disclosure claims arising in the foreign military sales context.  *See* ECF No. 72 at 3-6.  When the United States furnishes assistance "in connection with" a foreign military sale, section 2356(a)(2) provides that "reasonable and entire compensation" is the "*exclusive* remedy" for a disclosure by the United States Government of information that is "protected by law" and "held by the United States Government subject to restrictions imposed by the owner."  22 U.S.C. § 2356(a)(2) (emphasis added).  The Government contends this language applies squarely to ATSC's disclosure claims and thereby precludes injunctive relief.  ECF No. 72 at 6.  ATSC counters that 22 U.S.C. § 2356(a)(2) protects patents and analogous registered intellectual property rights akin to 28 U.S.C. § 1498, so it does not apply to ATSC's claims seeking protection for trade secrets or bid proposal information.  ECF No. 76 at 7-8.  Additionally, ATSC contends 22 U.S.C. § 2356 creates a conflict with 28 U.S.C. § 1491(b)(1), which grants this court jurisdiction to award injunctive relief in bid protests.  ECF No. 76 at 9-11.  The court addresses these arguments in turn below.[9]

### A.    The Text and History of § 2356(a)(2) Limit ATSC to Monetary Recovery for its Disclosure Claims.

ATSC seeks to avoid 22 U.S.C. § 2356(a)(2) by arguing that it covers registered intellectual property rights analogous to those protected by 28 U.S.C. § 1498.  ECF No. 76 at 7-8.  The Government contends the section's scope is broader based on its plain text.  ECF No. 72 at 3-6.  In the patent context, the Court of Claims has determined "reasonable and entire compensation" under 22 U.S.C. § 2356(a)(1) is the exclusive remedy for patent infringement in connection with foreign military sales.  *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 914 (Ct. Cl. 1976).  ATSC's disclosure claims are not patent infringement claims, so these claims could implicate only 22 U.S.C. § 2356(a)(2).

To determine what relief ATSC may seek for its disclosure claims, the court must first examine the plain language of 22 U.S.C. § 2356(a)(2).  *See Williams v. Taylor*, 529 U.S. 420, 431 (2000) ("We start, as always, with the language of the statute." (citation omitted)).  Thus, the court must consider the meaning of the following language:

---

[9] The parties also raise several other arguments pertaining to the disclosure claims: (1) whether ATSC's PIA claim is barred by the statute of limitations in 41 U.S.C. § 2106, (2) whether ATSC's proprietary information falls under the definition of "bid or proposal information" in 41 U.S.C. § 2101 such that it merits protection under the PIA, (3) whether ATSC can prevail on the merits of its PIA claim, (4) whether this court can entertain trade secrets claims, and (5) whether ATSC can prevail on the merits of its trade secrets claim.  *See generally* ECF No. 65; ECF No. 67; ECF No. 69; ECF No. 72.  Because 22 U.S.C. § 2356 mandates that the exclusive remedy for these claims is monetary relief, these issues are best resolved regarding a claim under that provision.

> Whenever, in connection with the furnishing of assistance under this chapter--
>
> > . . .
> >
> > (2) information, which is (A) protected by law, and (B) held by the United States Government subject to restrictions imposed by the owner, is disclosed by the United States Government or any of its officers, employees, or agents in violation of such restrictions,
>
> the exclusive remedy of the owner, except as provided in subsection (b) of this section, is to sue the United States Government for reasonable and entire compensation for such practice or disclosure in the district court of the United States for the district in which such owner is a resident, or in the United States Court of Federal Claims . . . .

22 U.S.C. § 2356(a)(2). A plain reading of the text leads the court to conclude 22 U.S.C. § 2356(a)(2) covers ATSC's disclosure claims.

Before turning to the operative language, the court must determine whether this procurement falls within the scope of 22 U.S.C. § 2356. Section 2356 opens by making clear it applies "in connection with the furnishing of assistance under this chapter." 22 U.S.C. § 2356(a). After the initial passage of 22 U.S.C. § 2356,[10] Congress moved the operative language governing this procurement to another chapter. Although the text of 22 U.S.C. § 2356 could be read to exclude this procurement from the reach of 22 U.S.C. § 2356, the Court of Claims definitively concluded that despite the movement of the FMS program to another chapter, 22 U.S.C. § 2356 still applies to procurements under the FMS program. *Hughes Aircraft Co.*, 534 F.2d at 914.

Turning to the operative language of the section, the court recognizes that the phrase "in connection with" tends to be very broad in its reach. *E.g.*, *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). Here, the Navy developed the solicitation to facilitate a foreign military sale to Egypt, so this procurement is in connection with the furnishing of assistance that 22 U.S.C. § 2356 covers.

Section 2356's text covers information "protected by law" that is "held by the United States Government subject to restrictions imposed by the owner." 22 U.S.C. § 2356(a)(2). ATSC claims its proprietary information includes various briefings, its OV-1, data sheets, its statement of work, and components of its NMSS, and it asserts this information is protected as bid or proposal information under the PIA, as trade secrets under trade secrets laws, and as trade

---

[10] The court provides a detailed history of the statutory evolution of the foreign military sales program below.

secrets under the Fifth Amendment's Takings Clause.[11]  *See* ECF No. 65 at 53-60; ECF No. 69 at 19-26.  Specifically, ATSC points to its [ * * * ] architecture and the [ * * * ] as proprietary information.  ECF No. 65 at 53, 57-60; ECF No. 69 at 20-22, 25-26.  The court will assume, without deciding, that the PIA, trade secrets law, or the Fifth Amendment may protect ATSC's proprietary information, so ATSC's proprietary information is "protected by law" under 22 U.S.C. § 2356(a)(2)(A).[12]

ATSC shared its proprietary information with the Navy, which ATSC marked with proprietary markings warning against disclosure.  ECF No. 56-1 at AR100453-500, AR100550, AR100791-826, AR100897-942, AR100945-56, AR101413-55, AR101538-55; ECF No. 65 at 50.  Thus, the Navy held ATSC's information "subject to restrictions" imposed by ATSC.  *See* 22 U.S.C. § 2356(a)(2).  ATSC's disclosure claims challenge the disclosure of its proprietary information in the Navy's solicitation.  *Id.* at 50-60; ECF No. 69 at 19-26.  If the Navy disclosed ATSC's information in the solicitation, then the Navy "disclosed" ATSC's information "in violation of" ATSC's restrictions on disclosure provided in its proprietary markings.  *See* 22 U.S.C. § 2356(a)(2).  As a result, a plain reading of the text indicates ATSC's disclosure claims, if successful, would fall squarely under 22 U.S.C. § 2356(a)(2).  Because the "exclusive remedy" for disclosure under 22 U.S.C. § 2356(a)(2) is "reasonable and entire compensation," the plain text of 22 U.S.C. § 2356(a)(2) precludes injunctive relief on the disclosure claims.

The history of 22 U.S.C. § 2356, which Congress modelled on 28 U.S.C. § 1498, further confirms that monetary relief is the sole remedy for ATSC's disclosure claims.  Starting in 1918,[13] 28 U.S.C. § 1498 allowed patent owners to sue the government for patent infringement, and the corresponding remedy was "reasonable and entire compensation" for the infringement:

> [W]henever an invention described in and covered by a patent of
> the United States shall hereafter be used or manufactured by or for
> the United States without license of the owner thereof or lawful
> right to use or manufacture the same, such owner's remedy shall be
> by suit against the United States in the Court of Claims for the

---

[11] ATSC has provided no authority allowing this court to enjoin the Government to prevent a taking under the Fifth Amendment in the bid protest context (or anywhere else).  But the Supreme Court has made clear that "[e]quitable relief is not available to enjoin an alleged taking of private property for public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) (footnote and citation omitted).  More recently, the Supreme Court explained that "because the federal . . . government[] provide[s] just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable."  *Knick v. Twp. of Scott*, 588 U.S. 180, 201 (2019).  Given that 22 U.S.C. § 2356 plainly allows the Government to disclose protected information and provides for just compensation, ATSC's argument for an injunction to prevent a taking under the Fifth Amendment fails.

[12] If none of these sources of law protect ATSC's information, then ATSC's disclosure claims would similarly fail.

[13] Congress passed a predecessor statute in 1910, but the relevant history begins with the 1918 amendments.

recovery of his reasonable and entire compensation for such use and manufacture.

Pub. L. No. 65-182, ch. 114, 40 Stat. 705 (1918). Congress initially adopted 28 U.S.C. § 1498 to ensure the government could obtain necessary materials needed during World War I without fear of injunctions prohibiting manufacturing of those materials. *See Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 342-45 (1928). Congress accomplished this by giving patent owners a monetary remedy akin to just compensation for a taking under the Fifth Amendment, but no injunctive relief. *Id.* at 342-46.

A few decades later, Congress first adopted a predecessor to 22 U.S.C. § 2356 in section 517 of the Mutual Security Act of 1951. Mutual Security Act of 1951, Pub. L. No. 82-165, § 517, 65 Stat. 382-83 (1951); *Hughes Aircraft Co.*, 534 F.2d at 912-13. As the Court of Claims concluded, the purpose of section 517 was to confirm the availability of the monetary remedy provided by 28 U.S.C. § 1498 "in cases of infringements of United States patents in production for foreign governments." *Hughes Aircraft Co.*, 534 F.2d at 913 (internal quotation marks omitted) (quoting H. Rep. No. 82-872, at 57 (1951)).

Section 517, however, was drafted with broader language than 28 U.S.C. § 1498. Section 517 of the Mutual Security Act of 1951 covered both patented inventions and "information":

> As used in this section—
>
> > (1) the term "invention" means an invention or discovery covered by a patent issued by the United States; and
> >
> > (2) the term "information" means information originated by or peculiarly within the knowledge of the owner thereof and those in privity with him, which is not available to the public and is subject to protection as property under recognized legal principles.

Mutual Security Act § 517(a). Likewise, the monetary remedy in section 517 extended beyond just patent infringement in connection with foreign military assistance to cover damaging disclosures of information by the government in connection with foreign military assistance:

> Whenever, in connection with the furnishing of any assistance in furtherance of the purposes of this Act—
>
> > (1) use within the United States, without authorization by the owner, shall be made of an invention; or
> >
> > (2) damage to the owner shall result from the disclosure of information by reason of acts of the United States or its officers or employees,
>
> The exclusive remedy of the owner of such invention or information shall be by suit against the United States in the Court

26

of Claims or in the District Court . . . for reasonable and entire
compensation for unauthorized use or disclosure. . . .

Mutual Security Act § 517(b).  Section 517 thus aimed to provide the same remedy as 28 U.S.C.
§ 1498 in foreign government productions:

[T]o assure an uninterrupted flow of materials for the purpose of
military assistance, because in many instances, materials for our
allies will not be purchased directly by the United States and in the
absence of this legislation, a patent owner could enjoin a
manufacturer from supplying the materials if patent infringement
exists.

*Hughes Aircraft Co.*, 534 F.2d at 913 (internal quotation marks omitted) (quoting *H.R. 5020 and
H.R. 5113: Hearing Before the H. Comm. on Foreign Affairs*, 82d Cong., at 1420 (1951)
(testimony of Captain Robillard)).

In 1954, Congress re-enacted section 517 "without any significant change."  *Robinson v.
United States*, 236 F.2d 24, 28 (2d Cir. 1956); Mutual Security Act of 1954, Pub. L. No. 83-665,
§ 506, 68 Stat. 852 (1954); *see* 32 C.F.R. § 264.5(a) ("With respect to interchanges in
furtherance of the purposes of the Mutual Security Act of 1954, as amended, section 506 of the
Mutual Security Act of 1954, as amended . . . provides the exclusive remedy for compensation
. . . for damage resulting from the disclosure by the United States of privately owned technical
information.").

Based on the history of the 1951 and 1954 the Mutual Security Acts, the Court of Claims
determined the purpose of this section was "to allow the Government to make available to
friendly nations patents and technical know-how without threat of an injunction proceeding by
an aggrieved inventor" and "to give relief to an inventor who has had his invention used without
his authority."  *Kaplan v. United States*, 153 F. Supp. 787, 789 (Ct. Cl. 1957).  Thus, the purpose
of the predecessor to 22 U.S.C. § 2356 largely resembled the purpose of enacting 28 U.S.C.
§ 1498, yet the scope of the Mutual Security Act provisions was broader than 28 U.S.C. § 1498.

In 1960, Congress amended 28 U.S.C. § 1498 to provide a monetary remedy for
copyright infringement by the government.  Pub. L. No. 86-726, 74 Stat. 855-56 (1960); 28
U.S.C. § 1498(b).  Section 1498(b) covers infringement of "the copyright in any work protected
under the copyright laws of the United States."  28 U.S.C. § 1498(b).  That narrow language
provides that 28 U.S.C. § 1498(b) supplies a remedy for copyright infringement but does not
cover broader disclosures of information.  *Compare* 28 U.S.C. § 1498(b), *with* Mutual Security
Act § 517, *and* Mutual Security Act § 506.

The following year, Congress passed the Foreign Assistance Act of 1961.  The Foreign
Assistance Act of 1961 repealed the Mutual Security Act, but contained a provision that was
"substantially identical" to section 506 of the Mutual Security Act of 1954:

Whenever, in connection with the furnishing of assistance under
this Act—

> (1) an invention or discovery covered by a patent issued by
> the United States Government is practiced within the
> United States without the authorization of the owner, or
>
> (2) information, which is (A) protected by law, and (B)
> held by the United States Government subject to
> restrictions imposed by the owner, is disclosed by the
> United States Government or any of its officers, employees,
> or agents in violation of such restrictions,

the exclusive remedy of the owner . . . is to sue the United States
Government for reasonable and entire compensation for such
practice or disclosure in the district court of the United States . . . ,
or in the Court of Claims . . . .

Foreign Assistance Act of 1961, Pub. L. No. 87-195, § 606, 75 Stat. 440-41 (1961); *Hughes Aircraft Co.*, 534 F.2d at 912. Section 606(a) of the Foreign Assistance Act of 1961 was codified at 22 U.S.C. § 2356(a), where it remains in substantially the same form today.

By its terms, 22 U.S.C. § 2356(a)(2) covers disclosures of "information," which is broader in scope than the text of 28 U.S.C. § 1498(b)—enacted the year before—providing a monetary remedy for copyright infringement specifically. *Compare* 22 U.S.C. § 2356(a)(2), *with* 28 U.S.C. § 1498(b). In other words, if Congress sought to limit 22 U.S.C. § 2356(a)(2) to registered intellectual property as ATSC argues, Congress had the clearest model for such language hot off the press in 28 U.S.C. § 1498(b). Congress, however, chose to use broader language in 22 U.S.C. § 2356(a)(2), which leads this court to conclude that Congress did not limit 22 U.S.C. § 2356 to registered intellectual property rights analogous to patents or copyrights.

Beyond the statute's text and history, precedent supports that 22 U.S.C. § 2356(a)(2) covers more than claims connected to registered intellectual property rights analogous to patents. The Court of Claims has suggested that 22 U.S.C. § 2356(a)(2) covers trade secrets claims. In *Bates v. United States*, 214 Ct. Cl. 832 (1977), a plaintiff brought two proprietary information claims: (1) a patent infringement suit under 28 U.S.C. § 1498, and (2) a suit for improper disclosure of "confidential information involving the subject matter of the patent" under 28 U.S.C. § 1491 and 22 U.S.C. § 2356(a). *Bates*, 214 Ct. Cl. at 832. With respect to the latter claim, the court considered whether the plaintiff had a claim for disclosure of information "beyond the scope of the patent." *Id.* at 834. Notably, if the government "improperly disclosed" the non-patented information "meriting trade secret protection," the court indicated the plaintiff might have been able to recover for that disclosure. *See id.* The court did not decide whether the plaintiff would recover under 22 U.S.C. § 2356(a) for disclosure of information protected by trade secrets law, however, because the court remanded the case for further fact-finding to determine if the six-year statute of limitations barred the disclosure claim. *See id.* at 834-36. *Bates* suggests the Court of Claims considered trade secrets to fall within the purview of 22 U.S.C. § 2356(a)(2), which would bar the injunctive relief ATSC seeks.

Additionally, the Ninth Circuit considered the scope of 22 U.S.C. § 2356(a)(2) in *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030 (9th Cir. 1983). There, the court concluded that claims for "fraud, breach of contract, attempt to monopolize, or anything else not pertaining to disclosure of proprietary information" did not fall within the scope of 22 U.S.C. § 2356(a)(2). *Northrop Corp.*, 705 F.2d at 1040. But the Ninth Circuit did conclude that claims for "misuse and misappropriation" of proprietary data fall within 22 U.S.C. § 2356(a)(2)'s scope. Specifically, the court concluded that "[t]o the extent that any disclosure claims involve FMS sales, 22 U.S.C. § 2356 is the exclusive remedy." *Id.*

Taken together, the text, history, and precedent support that 22 U.S.C. § 2356(a)(2) covers broader claims resulting from disclosure of proprietary information in the FMS context than 28 U.S.C. § 1498 provides in the domestic context. The court concludes 22 U.S.C. § 2356(a)(2) applies to ATSC's disclosure claims and bars ATSC's request for injunctive relief on those claims.

### B.    Section 2356(a)(2) Governs the Applicable Remedy in this Case.

ATSC also seeks to avoid 22 U.S.C. § 2356's exclusive monetary relief by arguing that injunctive relief under 28 U.S.C. § 1491(b) must be available for its disclosure claims. *See* ECF No. 76 at 10-11. Here, ATSC argues that reading 22 U.S.C. § 2356 to preclude injunctive relief creates a conflict with 28 U.S.C. § 1491(b), which allows injunctive relief in bid protests. *Id.* at 9-11. Thus, ATSC argues 28 U.S.C. § 1491(b) should control as the later-enacted statute. ECF No. 76 at 9. On the other hand, the Government argues 22 U.S.C. § 2356(a)(2) should control because it provides a more precise remedial scheme that is applicable to the specific facts of this case. ECF No. 72 at 5. In other words, 28 U.S.C. § 1491(b) applies broadly to provide injunctive relief in bid protests, but 22 U.S.C. § 2356(a)(2) limits the relief available in the specific circumstances of this case.

The Supreme Court has "long recognized that an additional remedy in the Court of Claims is foreclosed when it contradicts the limits of a precise remedial scheme." *United States v. Bormes*, 568 U.S. 6, 13 (2012) (collecting cases); *see also Horne v. Dep't of Agric.*, 569 U.S. 513, 527 (2013) ("To determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes.'" (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988))). 28 U.S.C. § 1491(b) grants this court authority to issue injunctive relief in an "action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b). This authority applies to procurement actions broadly. On the other hand, 22 U.S.C. § 2356(a) provides a precise remedy—reasonable and entire compensation—for unauthorized disclosures of protected information in the FMS context. As the provision providing a more precise remedy, 22 U.S.C. § 2356(a) controls. *See Bormes*, 568 U.S. at 13.

ATSC further seeks to avoid 22 U.S.C. § 2356 by arguing that barring injunctive relief under 28 U.S.C. § 1491(b) would create inconsistent relief for unauthorized disclosures of proprietary information in domestic procurements compared to FMS procurements. ECF No. 76 at 10-11. But the history of 22 U.S.C. § 2356(a) explains why unauthorized disclosures are

treated differently in the FMS context than in the domestic context. Section 2356(a) prevents disruptive injunctions from halting foreign military sales by providing a monetary remedy instead. *See Kaplan*, 153 F. Supp. at 789; 22 U.S.C. § 2356(a). This purpose mirrors the purpose of 28 U.S.C. § 1498, as discussed *supra* Section V.A, although 22 U.S.C. § 2356 is broader in scope than 28 U.S.C. § 1498. The text, history, and precedent support that 22 U.S.C. § 2356(a) serves this purpose in the FMS context by preventing injunctions in both patent infringement cases and unauthorized disclosure cases.

Under ATSC's theory, this court would be able enjoin an FMS procurement when the resulting contract raises unauthorized disclosure concerns, but not when an FMS procurement infringes on a patent. Again, under 28 U.S.C. § 1498(a), which Congress adopted long before ADRA, the exclusive remedy for patent infringement by the Government is monetary relief. There are very few cases addressing this argument, presumably because potential protestors understand 28 U.S.C. § 1498(a) to preclude injunctive relief. That said, the one post-ADRA case from this court that addresses the issue that this court could locate makes clear that "the possibility that an offeror's proposal will infringe upon a patent . . . does not provide a basis for enjoining a procurement." *Interspiro, Inc. v. United States*, 72 Fed. Cl. 672, 683 (2006). This is also how the courts resolved the question before ADRA. *See Hughes Aircraft Co.*, 534 F.2d at 914; *see also TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060-61 (Fed. Cir. 1986). Accordingly, the court cannot enjoin the present procurement based on ATSC's disclosure claims. Here, ATSC's complaint is with Congress, not the Navy.

This is not to say that that the United States may disclose ATSC's proprietary information with impunity just because this case involves a foreign military sale. To the contrary, 22 U.S.C. § 2356 provides that ATSC may receive monetary compensation if it establishes that the Navy unlawfully disclosed its protected information.[14]

## VI.    Conclusion

For the foregoing reasons, the court DENIES ATSC's motion for judgment on the administrative record, ECF No. 65. The court GRANTS the Government's cross-motion for judgment on the administrative record, ECF No. 67. The Clerk's Office is directed to enter judgment for the Government and dismiss the complaint. For the avoidance of doubt, this dismissal is without prejudice to ATSC filing an action under 22 U.S.C. § 2356 if and when it is harmed by the alleged disclosure of its protected information.

It is so ORDERED.

---

[14] The existence of a monetary remedy under 22 U.S.C. § 2356(a)(2) underscores that injunctive relief is not available for ATSC's disclosure claims. To award injunctive relief, ATSC must establish that it will suffer irreparable harm without an injunction—i.e., that there is no adequate remedy at law. But monetary relief *is* an adequate remedy at law that is sufficient to repair many harms.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge